

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-17-00197-CV

BALL UP, LLC

APPELLANT

V.

STRATEGIC PARTNERS CORP; PG-ACP HOLDINGS, L.P.; PG-ACP HOLDINGS GP, LLC; AND MIKE SINGER

APPELLEES

----------

AND

## NO. 02-17-00198-CV

STRATEGIC PARTNERS ACQUISITION CORP. F/K/A PG-ACP ACQUISITION CORP.

APPELLANT

V.

BALL UP, LLC

APPELLEE

----------

### FROM THE 17TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 017-283538-16

----------

# MEMORANDUM OPINION[1]

----------

## I. INTRODUCTION

These two related interlocutory appeals arise from the trial court's orders sustaining and denying special appearances. Because the facts concerning these appeals are intertwined, we dispose of them in a single memorandum opinion.

Appellant Ball Up, LLC filed suit in Tarrant County, Texas, alleging causes of action for fraud/intentional misrepresentation, conspiracy, and alternatively negligent misrepresentation. Ball Up named as defendants: Mike Singer individually; Strategic Partners, Inc.; Strategic Distribution, LP; and Strategic General Partners, LLC—these three entity defendants made general appearances and are not parties to these appeals. Ball Up's Tarrant County suit also named as defendants Strategic Partners Corp.; PG-ACP Holdings, L.P.; PG-ACP Holdings GP, LLC; and Strategic Partners Acquisition Corp. (individually, SPAC).[2]

After a hearing, the trial court signed orders and amended orders sustaining special appearances filed by Singer individually and the Appellee

---

[1]*See* Tex. R. App. P. 47.4.

[2]Ball Up also sued Strategic Partners Midco, LLC but subsequently dismissed that defendant, so Strategic Partners Midco, LLC is not a party to this appeal.

Entities—Strategic Partners Corp.; PG-ACP Holdings, L.P.; and PG-ACP Holdings GP, LLC. The trial court denied the special appearance filed by SPAC. The trial court did not issue findings of fact and conclusions of law.

Ball Up perfected an interlocutory appeal from the trial court's orders sustaining the special appearances of Singer and the Appellee Entities. Ball Up raises three issues. Ball Up's first issue claims that although Ball Up is a nonsignatory, nonparty to Singer's unsigned personal investment contracts with two entities named One Holdings, LLC and Midland Entertainment, LLC,[3] Ball Up may nonetheless enforce the forum-selection clauses contained in those investment contracts to obtain personal jurisdiction over Singer in Texas. Ball Up's second and third issues claim that the trial court erred by sustaining Singer's and the Appellee Entities' special appearances because Ball Up pleaded and proved that "their work on an apparel and footwear project [was] centered in Texas with a Texas company and because they directed a tort at Texas, to cause harm in Texas to a Texas company."

SPAC also perfected an interlocutory appeal from the trial court's order denying its special appearance and raises a single issue asserting that Ball Up failed to plead or prove facts establishing general or specific jurisdiction over

---

[3]The record reflects that Singer loaned funds to Worldwide One Media in return for membership interests in Midland Entertainment. Because this distinction is not pertinent to the issues in this appeal, we hereinafter refer to this transaction simply as Singer's investment in Midland Entertainment.

3

SPAC exists in Texas and that SPAC offered jurisdictional evidence establishing that it is a nonresident that lacks any contacts with Texas.

For the reasons set forth below, we hold that Ball Up cannot enforce the forum-selection clauses contained in Singer's personal investment contracts with One Holdings and Midland Entertainment because Ball Up is neither a party nor a signatory to the investment contracts. We also hold that Ball Up did not plead facts establishing personal jurisdiction exists in Texas over Singer, over each of the Appellee Entities, or over SPAC or prove facts establishing a jurisdictional alter-ego/veil-piercing theory whereby the acts or contacts of the generally-appearing defendants, the Appellee Entities, or SPAC could be attributed to another of them for jurisdictional purposes. Accordingly, we will affirm the trial court's orders granting the special appearances of Singer and the Appellee Entities, reverse the trial court's order denying SPAC's special appearance, render judgment dismissing SPAC from the suit filed by Ball Up, and remand this case to the trial court for further proceedings consistent with this opinion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Ball Up Negotiates with Singer Concerning the Manufacture of Shoes and Apparel as Part of Ball Up's "Million Dollar Summer Challenge"

Ball Up is a Texas limited liability company and, according to its pleadings, is an internationally recognized "street" basketball entertainment company.[4] Ball

---

[4]Ball Up pleaded and asserts that it is a Texas limited liability company with its principal place of business in Tarrant County, Texas. Appellees assert, however, that Ball Up is headquartered in California.

4

Up contends that it invested significant funds into the 2015 "Million Dollar Summer Challenge"—a nationwide street basketball tournament featuring teams and players from cities across the country. The Million Dollar Summer Challenge included over $1 million in prizes, and the championship game aired on ESPN 2. Ball Up utilized the Million Dollar Summer Challenge to launch and promote Ball Up's new line of footwear and apparel; Ball Up planned for participants in the Million Dollar Summer Challenge to return to their respective cities across the country—New York, Chicago, etc.—wearing Ball Up apparel and footwear, thereby generating a market for Ball Up products.

In 2014, Singer and Ball Up entered into negotiations to create a joint venture between Ball Up and some of the defendant companies to create, market, sell, and distribute Ball Up's new line of apparel and footwear (the Ball Up Apparel Project). Singer and the Appellee Entities claim that the proposed joint-venture negotiations occurred between Ball Up and Singer, as CEO of the generally-appearing defendant Strategic Distribution, LP, and occurred in California or by phone or e-mail; that Singer never traveled to Texas as a part of the negotiations; and that no joint venture agreement was ever actually consummated.

Ball Up, however, in its pleadings and on appeal identifies the generally-appearing defendants, the Appellee Entities, and SPAC all together in its

jurisdictional contentions as "SP";[5] for ease of reading, we likewise refer to the generally-appearing defendants, the Appellee Entities, and SPAC collectively as the "SP Companies." Ball Up contends that Singer arranged for representatives

[5]Ball Up's live pleading—its third amended original petition—stated:

13. At all times relevant herein, ["SP"] and Mike Singer conducted business and/or tortious activities in the State of Texas in general, and specifically in relation to the business effort, acts[,] and omissions described below. . . .

14. SP has many employees and a very large business facility in Texas[.] . . .

. . . .

25. Each of the defendants were involved in the Ball Up project. . . . SP emphasized its Texas distribution center. . . . SP conducted Ball Up representatives on two separate tours of the Texas distribution center, and on a third occasion, SP also conducted a project meeting with Ball Up at the Texas distribution center.

26. . . . All of the actions of [the] project were integrated amongst the defendants. The Ball Up project and SP's decision to enter into the fraudulent scheme to terminate it[] was the result of the activities of the defendants amongst themselves. . . .

Likewise, Ball Up's brief states that

Singer and the SP entities were each involved in the Ball Up project[.] . . . Singer and the SP Entities emphasized the impressiveness and utility of their Dallas, Texas[,] distribution center[.]

. . . .

The SP Entities failed to maintain separate and distinct corporate identities such that the presence or contacts of one in Texas may be attributed to the others.

6

of the SP Companies to take Ball Up's representatives on two separate tours of a Texas distribution center—which the Appellee Entities, SPAC, and Singer claim is owned and operated by generally-appearing Strategic Distribution, LP. Ball Up alleges that this Texas distribution center was emphasized during the joint-venture negotiations due to its impressiveness and location and was "critical" to and a "key reason" for Ball Up's decision to do business with the SP Companies. Ball Up contends that a third meeting also occurred between Ball Up's and the SP Companies' representatives at the Texas distribution center.

**B. Singer Personally Invests in One Holdings, LLC and Midland Entertainment, LLC—Entities Purportedly Sharing Leadership With Ball Up**

Around the same time that Ball Up engaged in joint-venture negotiations regarding the Ball Up Apparel Project, Singer decided to make personal investments totaling $3.1 million dollars[6] in two Texas limited liability companies—One Holdings, LLC and Midland Entertainment, LLC—both of which are operated by the same men who operate Ball Up: Bob Keetch and Demetrius Spencer. Ball Up argues that One Holdings and Ball Up have a "symbiotic" relationship, with One Holdings essentially providing production and media support for Ball Up.

During the negotiations between attorneys for Singer and One Holdings, regarding Singer's investment in One Holdings and Midland Entertainment, the

---

[6]Of the $3.1 million dollars total, Ball Up alleges $2.5 million dollars went to purchase a 5% ownership interest in One Holdings.

parties exchanged several drafts of investment contracts, but none of the contracts were ever signed. Both the "Fourth Amended and Restated Company Agreement of One Holdings, LLC" (Company Agreement) and the "One Holdings, LLC Subscription Agreement" (Subscription Agreement)[7] provided to Singer and his attorneys contain forum-selection clauses, which Ball Up alleges apply in this case to bind Singer and to subject him to personal jurisdiction in Texas for Ball Up's lawsuit relating to the Ball Up Apparel Project.[8]

The relevant portion of the Company Agreement provides as follows:

**11.11. <u>Venue.</u> THE PARTIES HERETO CONSENT THAT VENUE OF ANY ACTION BROUGHT UNDER THIS AGREEMENT SHALL BE IN TARRANT COUNTY, TEXAS, <u>PROVIDED</u>, <u>HOWEVER</u>, THAT VENUE OF SUCH ACTION IS LEGALLY PROPER IN TARRANT COUNTY, TEXAS.**[9]

---

[7]We refer to the Company Agreement and the Subscription Agreement collectively as the One Holdings Contracts.

[8]Ball Up also relies on the language of the "Amended and Restated Company Agreement of Midland Entertainment, LLC" and its corresponding Loan Agreement to argue that Singer has consented to jurisdiction in Texas. Those agreements, however, contain Texas choice-of-law provisions, not forum-selection clauses, and more importantly, Ball Up is not a party to or a signatory to those agreements either.

[9]All the parties to this appeal treat this provision as a forum-selection clause, so for purposes of this opinion, and because doing so does not alter our analysis or holding in this appeal, we do so as well. *But see In re Rigney Constr. & Dev., LLC*, No. 12-17-00370-CV, 2018 WL 719515, at *4 (Tex. App.—Tyler Feb. 6, 2018, orig. proceeding) (mem. op.) (recognizing a "critical distinction" between forum-selection clauses and venue-selection clauses because "venue selection cannot be the subject of a private contract unless otherwise provided by statute").

8

The related Subscription Agreement provided to Singer and his attorneys for his investments with One Holdings also states, in part, as follows:

4. Governing Law. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED, CONSTRUED[,] AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. THE PARTIES AGREE THAT **ANY LITIGATION DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT** MUST BE BROUGHT BEFORE AND DETERMINED BY A COURT OF COMPETENT JURISDICTION WITHIN THE STATE OF TEXAS, AND THE PARTIES HEREBY AGREE TO WAIVE ANY RIGHTS TO OBJECT, AND HEREBY AGREE TO SUBMIT TO THE JURISDICTION OF SUCH COURTS. [Emphasis added.]

At the special appearance hearing, Ball Up produced evidence that during Singer's negotiations concerning his investment with One Holdings and after Singer had wired the first $1 million of his investment, Singer's attorney suggested changing the forum-selection clause in the Company Agreement from Texas to California. One Holdings's attorney declined to make the change, and just a few days later, Singer wired another $1 million of the agreed investment to One Holdings. Singer requested that all documents be finalized before he sent the final $500,000 of his One Holdings investment. However, Singer ultimately transferred the funds without signing the One Holdings Contracts.

## C. Negotiations Breakdown, and the Ball Up Apparel Project Never Materializes

Ball Up contends that it needed more money to fund the Million Dollar Summer Challenge, so it approached Singer about a $1 million loan. Ball Up believed that Singer would be interested in seeing the Million Dollar Summer

9

Challenge succeed because he and the SP Companies had already invested approximately $1.2 million in the related Ball Up Apparel Project and because their investment returns would be affected by the success of the Million Dollar Summer Challenge.

Ball Up alleges that by this time, Singer had already become disgruntled with his investments in One Holdings and Midland Entertainment, so instead of loaning additional money to Ball Up to fund the Million Dollar Summer Challenge, Singer allegedly threatened to terminate the SP Companies' alleged involvement in the Ball Up Apparel Project unless One Holdings and Midland Entertainment refunded his personal investments. Ball Up claims that One Holdings and Midland Entertainment made the concessions that Singer requested but alleges that Singer still terminated the Ball Up Apparel Project.

### D. Ball Up Sues Singer and the SP Companies in Tarrant County, Texas

Although Ball Up asserts that the Million Dollar Summer Challenge was ultimately a success, Ball Up claims that it lost the opportunity to capitalize on this success due to the failure of the Ball Up Apparel Project, which was caused by Singer and the SP Companies. Thus, Ball Up filed suit in the 17th District Court of Tarrant County, Texas, alleging claims for fraud/intentional misrepresentation, conspiracy, and alternatively negligent misrepresentation against Singer and against the SP Companies.

### III. BALL UP'S FIRST ISSUE—THE FORUM-SELECTION CLAUSES

### A. The Parties' Positions

In its first issue, Ball Up contends that the trial court erred by sustaining Singer's special appearance because Singer consented to litigate Ball Up's fraud/intentional misrepresentation, conspiracy, and alternatively negligent misrepresentation claims against him in Texas state court based on the forum-selection clauses contained in Singer's personal investment contracts—the One Holdings Contracts.[10]  Ball Up points out that One Holdings and Midland Entertainment are "operated under the leadership of the same men who operated in Ball Up's leadership – Demetrius Spencer and Bob Keetch" and contends that Singer leveraged the Ball Up Apparel Project to convince Spencer and Keetch to refund Singer's investment in One Holdings and Midland Entertainment.  This alleged conduct by Singer, according to Ball Up, ties Ball Up's fraud/intentional misrepresentation, conspiracy, and alternatively negligent misrepresentation claims against Singer in connection with the Ball Up Apparel Project "directly or

---

[10]Six months after Ball Up filed the underlying lawsuit, Singer filed suit against, among other parties, One Holdings, LLC; Worldwide One Media, LLC; Midland Entertainment, LLC; Ball Up, LLC; and Keetch in Los Angeles Superior Court in California.  Ball Up asserts that Singer's California lawsuit is evidence that Singer considers his investments in One Holdings and Midland Entertainment to be related—at least indirectly if not directly—to the Ball Up Apparel Project.  We cannot agree because although Singer's lawsuit is referenced in a few places in the record before us, the record does not establish the facts or causes of action asserted by Singer in that case.

11

indirectly" to the One Holdings Contracts so that Ball Up's claims against Singer fall within the One Holdings Contracts' forum-selection clauses.

Ball Up further argues that the forum-selection clauses are binding on Singer and enforceable against him despite the fact that he did not sign the One Holdings Contracts and argues that Ball Up's claims against Singer are directly or indirectly related to Singer's personal investments via the One Holdings Contracts because "Ball Up Alleges that Singer's Investment Dispute was the Basis for His Tortious Conduct, and Singer Cannot Disprove It."[11]

Singer counters, however, that even assuming the correctness of all of these contentions by Ball Up—that the forum-selection clauses contained in the One Holdings Contracts are binding on and enforceable against him and that his subjective reason for allegedly committing the torts Ball Up has pleaded was in some way tied to his investments in One Holdings and Midland Entertainment— nonetheless, Ball Up is a nonparty, nonsignatory, and total stranger to the personal investment transaction Singer entered into with One Holdings and

---

[11]Ball Up's brief explains:

2.  Singer Cannot Disprove the Allegations He Agreed to Jurisdiction

    Singer, in order to defeat Texas jurisdiction, must *prove* he did not agree to the Texas law, jurisdiction[,] and venue provisions in the [One Holdings Contracts].  Singer's only evidence against these allegations is his statement by affidavit that he never consented to the investment documents, despite wiring $3.1 million to Texas and numerous acts indicating his agreement.  Singer's affidavit – at most – raises a fact issue.  It *proves* nothing.  Singer failed to meet the required burden of proof.

12

Midland Entertainment via the unsigned One Holdings Contracts, and as such, Ball Up cannot enforce the forum-selection clauses contained in the One Holdings Contracts.[12]

In its reply brief, Ball Up explains its position that "Ball Up need not enforce Singer's jurisdiction agreement":

> Appellees cite to an arbitration case for the premise that Ball Up had an obligation to establish its right to enforce the forum selection clauses in the investment agreements, but this argument misses the mark. Singer agreed that "any litigation directly or indirectly relating to" his investments "must be brought before and determined by a court of competent jurisdiction within the State of Texas," and he waived jurisdictional objections to Texas. [Record citation omitted.] It's not a question of enforcement. It's a question of whether or not Singer agreed to jurisdiction in Texas for claims even indirectly relating to his investments. Ball Up alleged he did, and Singer could not disprove this.

## B. Procedural Burdens of Proof Concerning Forum-Selection Clauses

A party to an agreement seeking to enforce the agreement's forum-selection clause bears the initial burden of proving that (1) the parties entered into an agreement to litigate in an exclusive forum and (2) the agreement applies to the claims involved. *See Lujan v. Alorica*, 445 S.W.3d 443, 448 (Tex. App.—El Paso 2014, no pet.); *Young v. Valt.X Holdings, Inc.*, 336 S.W.3d 258, 262

---

[12]Because we ultimately agree with Singer that Ball Up cannot enforce the forum-selection clauses contained in the One Holdings Contracts against Singer in Ball Up's underlying lawsuit against Singer, we need not address Ball Up's arguments that Singer is bound by the forum-selection clause because he allegedly ratified the unsigned One Holdings Contract by conduct. *See* Tex. R. App. P. 47.1 (providing that appellate court must address only issues necessary for disposition of appeal).

(Tex. App.—Austin 2010, pet. dism'd). The burden of establishing the existence of a valid and enforceable forum-selection clause includes proving that the party seeking to compel litigation in the contracted-for forum was a party to the agreement or had the right to enforce it. *See Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 443–47 (Tex. 2017); *see also In re Merrill Lynch Trust Co. FSB*, 123 S.W.3d 549, 554–55 (Tex. App.—San Antonio 2003, orig. proceeding) (so holding in the arbitration context), *mand. granted*, 235 S.W.3d 217 (Tex. 2007). That is, when a litigant seeks to compel litigation in a particular forum pursuant to a contract's forum-selection clause but that litigant was a nonparty, nonsignatory to the contract containing the forum-selection clause, the litigant seeking enforcement of the forum-selection clause bears the burden of establishing why and under what theory the litigant as a nonparty to a contract is nonetheless entitled to enforce the contract's forum-selection clause.[13]

---

[13]Texas cases addressing the enforcement of forum-selection clauses by or against nonsignatories to the underlying contract that contains the forum-selection clause obviously pivot on whether the nonsignatory is the plaintiff or the defendant and whether the nonsignatory is asserting or resisting application of the forum-selection clause. With the exception of footnote 15, we limit our discussion and analysis here to facts involving nonsignatory plaintiffs like Ball Up that seek to enforce a forum-selection clause against an alleged signatory defendant, like Singer.

## C. Substantive Law Concerning Who May Enforce Forum-Selection Clauses

A forum-selection clause, like an arbitration clause,[14] is generally enforceable only "by and against" a party to the agreement containing the forum-selection clause. *Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 443; *see also Black v. Diamond Offshore Drilling, Inc.*, No. 14-17-00011-CV, 2018 WL 2208205, at *4 (Tex. App.—Houston [14th Dist.] May 15, 2018, no pet.) ("As a general rule, an arbitration clause or forum[-]selection clause cannot be invoked by a nonparty to the contract." (citing *G.T. Leach Builders, LLC v. Sapphire V.P., L.P.*, 458 S.W.3d 502, 524 (Tex. 2015))). Because forum-selection clauses are creatures of contract, the circumstances in which nonsignatories or nonparties to a contract may enforce that contract's forum-selection clause are rare. *See Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 432 (holding nonsignatories Owens and Burke could not enforce forum-selection clause against signatories Sheldon and Konya).

Legal theories do exist, however, by which nonsignatories to a contract may nonetheless enforce a contract's arbitration provision or forum-selection clause against signatories. *See id.* (setting forth the following nonsignatory theories: (1) the transaction-participant theory; (2) the substantially

---

[14]Reference to cases addressing the applicability of arbitration clauses is appropriate when examining whether particular claims or parties fall within a forum-selection clause's reach. *Smith v. Kenda Capital, LLC*, 451 S.W.3d 453, 457 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 884 (Tex. 2010) (orig. proceeding)).

interdepent and concerted misconduct doctrine; and (3) the mandatory-venue provisions in sections 15.004 and 15.020 of the Texas Civil Practice and Remedies Code).[15]

Ultimately, we determine the intent of the parties as expressed in the terms of the agreement—by applying ordinary principles of state contract law—to ascertain whether, based on the language of the forum-selection clause, a nonsignatory to the contract may enforce it. *Black*, 2018 WL 2208205, at *4 (citing *G.T. Leach Builders, LLC*, 458 S.W.3d at 524, and *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (orig. proceeding)). The deliberate inclusion of language in contracts may extend forum-selection-clause enforcement rights to nonsignatories. *See Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 445 (citing *In re Rubiola*, 334 S.W.3d 220, 224–25 (Tex. 2011) (orig. proceeding), for the proposition that "parties to an arbitration agreement may

---

[15]Other theories exist permitting a nonsignatory defendant to enforce a forum-selection clause against a signatory plaintiff—as opposed to here where Ball Up as the nonsignatory plaintiff is seeking to enforce the forum-selection clause against the defendant Singer. *See Carlile Bancshares, Inc. v. Armstrong*, No. 02-14-00014-CV, 2014 WL 3891658, at *8 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.) (recognizing "direct-benefits estoppel" has been applied to allow a defendant signatory to enforce a forum-selection clause against a nonsignatory plaintiff who is suing based on the contract that contains the forum-selection clause); *see also Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305–06 (Tex. 2006) (recognizing two equitable circumstances when a signatory plaintiff may enforce an arbitration clause against a nonsignatory: (1) when the signatory plaintiff must rely on the contract's terms to assert its claims against the nonsignatory and (2) when the signatory plaintiff raises an allegation of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories).

grant nonsignatories the right to compel arbitration"). For example, because the agreement in *Rubiola* defined the term "parties" to include "Rubiola Mortgage Company and each and all persons and entities signing this agreement or any other agreement between or among any of the parties as part of this transaction" as well as "individual partners, affiliates, officers, directors, employees, agents, and/or representatives of any party to such documents[,]" the Texas Supreme Court held that Rubiola Mortgage Company's President and Vice President were, by express agreement, parties to the contract entitled to enforce the agreement's arbitration provision. *See id.* (quoting and explaining *Rubiola*, 334 S.W.3d at 222–23).

## D. Ball Up Does Not Allege Any Theory, and the Forum-Selection Clauses and Contracts Do Not Express Any Intent, for Enforcement by a Nonsignatory

The Company Agreement and the Subscription Agreement both contain forum-selection clauses; however, using common principles of contract law and the parties' chosen language as the "fulcrum of our inquiry," neither the Company Agreement nor the Subscription Agreement nor their respective forum-selection clauses contain language expressing any intent to extend enforcement rights to nonsignatories other than those listed. *Cf. Rubiola*, 334 S.W.3d at 224–25 (holding arbitration clause enforceable by nonsignatory based on broad definition of "parties" contained in the agreement). For example, the Company Agreement and its forum-selection clause are contractually limited to enforcement by and against the parties to it and the parties' respective heirs, legal representatives,

17

successors, and assigns.[16]  The Subscription Agreement and its forum-selection clause are likewise contractually limited to enforcement by and against the parties to it together with the parties' respective executors, administrators, successors, personal representatives, heirs, and assigns.[17]  *Compare Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 444–45 (analyzing plain language of shareholder agreement to conclude agreement precluded nonsignatories from enforcing the agreement's forum-selection clause), *with Rubiola*, 334 S.W.3d at 222–23 (reaching opposite conclusion when contract broadly defined parties to include "Rubiola Mortgage Company, and each and all persons and entities signing this agreement or any other agreements between or among any of the parties as part of this transaction" as well as "individual partners, affiliates, officers, directors, employees, agents, and/or representatives of any party to such documents").  Here, Ball Up does not assert that it is an executor,

---

[16]The Company Agreement states, in pertinent part: "**THE PARTIES HERETO CONSENT** . . . ."  The Company Agreement also provides:

> **11.07.  Binding Effect.**  Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement [is] binding on and inure[s] to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

[17]The Subscription Agreement states, in pertinent part: "THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED, . . . AND THE PARTIES HEREBY *AGREE* TO WAIVE ANY RIGHTS TO OBJECT, AND HEREBY AGREE."  [Emphasis added.]  The Subscription Agreement also provides that "[t]his Agreement shall be binding upon the parties hereto, together with their respective executors, administrators, successors, personal representatives, heirs[,] and assigns."

18

administrator, successor, legal or personal representative, heir, or assignee of a party to the One Holdings Contracts, and Ball Up does not point to any language in the One Holdings Contracts permitting Ball Up—a nonsignatory and nonparty to Singer's personal investment contracts with One Holdings and Midland Entertainment—to enforce the forum-selection clauses in those contracts. *See Black*, 2018 WL 2208205, at *4 (construing similar forum-selection clause and holding nonsignatories could not enforce it because they "do not argue they are 'successors or assigns, dependants [sic], executors[,] or administrators' of the parties").

Ball Up simply argues that by virtue of the unsigned One Holdings Contracts, Singer consented to Texas's personal jurisdiction over him, and Singer "cannot disprove it." But it is not Singer's burden to disprove his alleged consent to be bound by the forum-selection clauses in the One Holdings Contracts. It is Ball Up's burden to prove how Ball Up is authorized to enforce a forum-selection clause in Singer's One Holdings Contracts when Ball Up is a nonparty and nonsignatory to the One Holdings Contracts. *See Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 443, 447 (explaining that nonsignatories contended they could enforce the forum-selection clause in the shareholder's agreement under (1) the transaction-participant theory, (2) the substantially interdependent and concerted misconduct doctrine, and (3) the mandatory-venue provisions and concluding that because the nonsignatories "could not enforce the

19

forum-selection clause . . . under the legal theories presented, the trial court erred in granting their motion to dismiss").

Nor does Ball Up's factual allegation—that Ball Up, One Holdings, and Midland Entertainment share the same ownership or leadership—advance Ball Up's argument that it may enforce against Singer the forum-selection clauses in the One Holdings Contracts. *See id.* at 443 (holding that because Owens signed forum-selection-containing contract as company's CEO "but not in his individual capacity," when Owens in his individual capacity sought to enforce the forum-selection-containing contract he had signed as CEO, he was required to establish an exception to general rule of contracts that nonsignatory may not enforce contract); *see also In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007) (orig. proceeding) (explaining in the arbitration context that "[a] corporate relationship is generally not enough to bind a nonsignatory to an arbitration agreement"). Even if Keetch and Spencer had signed the One Holdings Contracts in their management or ownership capacity with those companies (which Ball Up does not allege or argue), Ball Up still would be unable to enforce the forum-selection clauses in those contracts against Singer based solely on this fact. *See Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 443. And even if Ball Up was a corporate affiliate of One Holdings or Midland Entertainment (which Ball Up does not allege or argue), Ball Up still would be unable to enforce the forum-selection clauses in the One Holdings Contracts

20

against Singer based solely on this fact.[18]  *See Merrill Lynch Tr. Co. FSB*, 235 S.W.3d at 191 (explaining that "corporate affiliates are generally created to separate the businesses, liabilities, and contracts of each.  Thus, a contract with one corporation—including a contract to arbitrate disputes—is generally not a contract with any other corporate affiliates").

Because Ball Up has neither pleaded nor offered jurisdictional evidence that it is an executor, administrator, successor, legal or personal representative, heir, or assign of any party to the One Holdings Contracts or Singer and has not pleaded or offered jurisdictional evidence of any other facts or legal theory articulating how Ball Up possesses authority to enforce the One Holdings Contracts' forum-selection clauses when Ball Up is a nonsignatory, nonparty, and stranger to the One Holdings Contracts, we hold that Ball Up may not enforce the One Holdings Contracts' forum-selection clauses against Singer to attain personal jurisdiction over him in Texas in Ball Up's suit for fraud/intentional misrepresentation, civil conspiracy, and alternatively negligent misrepresentation. We overrule Ball Up's first issue.[19]

---

[18]The pleadings, the record, and the briefing before us does not explain the legal relationship, if any, that exists between One Holdings, Midland Entertainment, and Ball Up or how they are allegedly related, even assuming some common ownership or management exists and that One Holdings and Ball up work on the same projects.

[19]Because Ball Up cannot enforce the One Holdings Contracts' forum-selection clauses in its suit against Singer, we need not address Ball Up's contention that the substance of its tort claims against Singer fall within those forum-selection clauses.  *See Pinto Tech.*, 526 S.W.3d at 440; *In re Int'l Profit*

21

**IV. BALL UP'S SECOND AND THIRD ISSUES AND SPAC'S SOLE ISSUE—PERSONAL JURISDICTION OVER SINGER, THE APPELLEE ENTITIES, AND SPAC**

In its second and third issues, respectively, Ball Up contends that the trial court possesses personal jurisdiction over Singer and the Appellee Entities because they worked on a project centered in Texas with a Texas company and because Ball Up provided evidence showing Singer's and Appellee Entities' intent and efforts directed at Texas to cause harm in Texas to a Texas Company.

In SPAC's sole issue in its appeal from the trial court order denying its amended special appearance, SPAC contends that the trial court erred by denying its special appearance because SPAC lacks the required minimum contacts with Texas.

We address these three issues together.

**A. Special Appearance Standard of Review and Burdens of Proof**

Texas special-appearance law dictates that the plaintiff and the defendant bear shifting burdens of proof in a personal jurisdiction challenge. *M & F Worldwide Corp. v. Pepsi–Cola Metro. Bottling Co.*, 512 S.W.3d 878, 887 (Tex. 2017); *see also* Tex. R. Civ. P. 120a. The plaintiff bears the initial burden to plead sufficient allegations to invoke jurisdiction under the Texas long-arm

_____

*Assocs., Inc.*, 274 S.W.3d 672, 677 (Tex. 2009) (orig. proceeding). And because Ball Up cannot enforce the One Holdings Contracts' forum-selection clauses against Singer, we need not address Ball Up's contention that Singer's subsequent suit filed in June 2016 in California against, among others, One Holdings, LLC; Worldwide One Media, LLC; Midland Entertainment, LLC; Ball Up, LLC; and Keetch is evidence that his investments are "directly or indirectly" related to the causes of action pleaded by Ball Up.

statute. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). A plaintiff may carry its initial pleading burden in its petition or its response to the defendant's special appearance. *Stull v. LaPlant*, 411 S.W.3d 129, 134 (Tex. App.—Dallas 2013, no pet.). However, if the plaintiff fails to plead facts bringing the defendant within reach of the Texas long-arm statute, the defendant need only prove that it does not live in Texas to negate jurisdiction. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658–59 (Tex. 2010) (citing S*iskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982)). If the plaintiff does plead facts bringing the defendant within reach of the Texas long-arm statute, a defendant who contests the trial court's exercise of personal jurisdiction bears the burden of negating all bases of jurisdiction alleged by the plaintiff. *Moki Mac River Expeditions*, 221 S.W.3d at 574*; Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002), *cert. denied*, 537 U.S. 1191 (2003).

Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading. *Kelly*, 301 S.W.3d at 658–59. A defendant can negate jurisdiction on either a factual basis or a legal basis. *Id*. A defendant negates jurisdiction on a factual basis by presenting evidence to disprove the plaintiff's jurisdictional allegations. *Id.* Alternatively, a defendant negates jurisdiction on a legal basis by showing that even if the plaintiff's jurisdictional allegations are true, the allegations are legally insufficient to establish personal jurisdiction. *Id*.

23

In determining whether a defendant has negated all potential bases for jurisdiction, the trial court frequently must resolve questions of fact. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). When a trial court does not issue findings of fact or conclusions of law to support its special-appearance determination, we presume that all factual disputes were resolved in favor of the trial court's ruling. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871 (Tex. 2010). The conclusion that personal jurisdiction exists over a defendant is a conclusion of law that we review de novo. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009).

### B. Ball Up's Pleadings

As partially set forth above, Ball Up's third amended original petition pleads that each of the defendants are separate foreign entities with principal places of business in California. Ball Up pleaded that "the entity defendants failed to maintain separate and distinct corporate entities such that the presence and/or contacts of one in Texas may be attributed to the others." In paragraphs 55 through 83, titled "SP's Acts on Ball Up Project," Ball Up sets forth acts it attributes globally to the SP Companies. In the remainder of its pleading, Ball Up sets forth its causes of action, again pleading claims "against Singer and SP for fraud/intentional misrepresentation" and "against Singer and SP for civil conspiracy" and asserting an "alternative claim against Singer and SP for negligent misrepresentation." Thus, Ball Up's third amended original petition

24

does not plead specific facts or acts attributable to any individual defendant; instead, Ball Up pleads acts or facts attributable to the SP Companies.

The Appellee Entities and SPAC—in addition to pointing out that Ball Up does not plead acts relating to any individual Appellee Entity or to SPAC—also point out that Ball Up's third amended original petition does not plead any "facts establishing that a tort was committed" in whole or in part in Texas. Although Ball Up's claims plead that "Singer and SP represented to Ball Up that they would fund, staff[,] and execute the design, creation, marketing[,] and sales of apparel and footwear carrying the Ball Up Brand," that "[t]hese were a [sic] material representations that turned out to be false," and that "SP and Singer combined to accomplish an unlawful purpose," Ball Up does not plead that any part of the alleged torts occurred in Texas.

### C. The Special Appearances and Evidence of the Appellee Entities, SPAC, and Singer

Each of the Appellee Entities—Strategic Partners Corp; PG-ACP Holdings, L.P.; and PG-ACP Holdings GP, LLC—and SPAC attached to their respective special appearances a separate affidavit of Robert Pierpoint as the Executive Vice President of Strategic Partners Corp; as the Vice President of PG-ACP Holdings, L.P.; as the Vice President of PG-ACP Holdings GP, LLC.; and as the Executive Vice President of SPAC. According to Pierpoint's affidavits concerning Strategic Partners Corp; PG-ACP Holdings, L.P.; and PG-ACP Holdings GP, LLC, these entities are, respectively, a Delaware corporation, a Delaware limited

25

partnership, and a Delaware limited partnership—all with their principal place of business in California. According to Pierpoint's affidavit concerning SPAC, it is a Delaware corporation with its principal place of business in California.

Pierpoint's affidavits explain that PG-ACP Holdings, L.P. and PG-ACP Holdings GP, LLC are holding companies with no employees, offices, or business contracts. All four of Pierpoint's affidavits state that each of these entities does not do business in Texas, does not solicit customers in Texas, does not own real property in Texas, does not maintain an office or have employees in Texas, does not have a registered agent for service of process in Texas, has not entered into any contracts performable in whole or part in Texas, has not committed any statutory violations or torts in Texas, has no relation to the allegations in Ball Up's third amended original petition, has never authorized any representative to make any representations on its behalf to Ball Up with respect to any proposed joint venture with Ball Up, and has neither incurred expenses nor engaged in actions relating to any proposed joint venture with Ball Up.

Singer attached his own affidavit to his special appearance. Singer's detailed, forty-seven paragraph, five-page, single-spaced affidavit explains that Ball Up's allegation—"that I generally conduct business and/or tortious activities in Texas"—"is false." Singer explains that he was born in California, lives in California, and has never lived in Texas. He states that he does not regularly conduct business in Texas. As the CEO of generally-appearing Strategic Distribution, L.P. (which Singer refers to as Strategic Distribution throughout his

26

affidavit), Singer states that he has "made telephone calls on an average of two to three times per year with Strategic Distribution's warehouse manager in Dallas, Texas," and has "had telephonic contact with Michael Penn at Williamson Dickie two to three times per year on matters unrelated to this suit." Singer explained that in his role as President of Strategic Distribution, he has "traveled to Texas on business for a tradeshow on one occasion," and that constitutes the totality of his contacts with Texas since January 2014. Singer states that he, individually, has never owned personal property or real estate in Texas; has never had a checking or savings account in Texas; has not committed a statutory violation, breach of contract, or tort, in whole or in part, in Texas; has never filed or defended a lawsuit in Texas; and has conducted no business activities in Texas with respect to Ball Up.

Singer explained that any work he performed regarding the proposed joint venture with Ball Up was for and on behalf of Strategic Distribution and was based out of Strategic Distribution's office in Chatsworth, California, except for one meeting in Oregon and when he was traveling to places other than Texas and possibly sent emails or made phone calls relating to the proposed Ball Up joint venture. Singer explained that in his corporate capacity, the Strategic Distribution employees he supervised with respect to the proposed Ball Up Apparel Project worked out of Strategic Distribution's office in Chatsworth, California.

27

Singer denies that the Ball Up Apparel Project was centered in Texas; he alleges that "[a]ll management and control of the proposed Ball Up project was centered in California where Ball Up and Strategic Distribution are headquartered and conduct operations" and that "there were hundreds of meetings [his] staff participated in with and without Robert Keetch ("Keetch") and Demetrius Spencer ("Spencer") of Ball Up, all of which took place in California."  Singer alleged that "Ball Up maintains its headquarters in Valley Village, California," and that as a representative of Strategic Distributions, his in-person communications with Ball Up representatives took place in Los Angeles County, California.   Singer's affidavit expressly denied Ball Up's allegation that "SP has many employees and a very large business facility in Texas, and those resources were involved in the business effort at issue in this lawsuit."  Singer pointed out,

> [w]hile Strategic Distribution (which has appeared in this matter) operates a distribution center in Dallas, Texas, that facility and the employees who work there had only incidental involvement with the proposed Ball Up project.  The project never reached a stage where there was even a single order from a retailer[,] so the manufacturing and distribution stage (outside of some samples and give-a-ways) was never realized and therefore never required significant involvement from Strategic Distribution's employees based in Dallas who handle distribution of manufactured apparel and footwear.

Likewise, Singer denied being present for or participating in any tour of the distribution center by any representative, investor, or potential investor of Ball Up.

Singer explained that in his capacity as Strategic Distribution's CEO, he was introduced to Spencer by a mutual acquaintance, Lavetta Willis, who knew Ball Up was looking for a company with the ability to design and manufacture Ball

28

Up shoes and apparel. Singer said that he and Spencer engaged in exploratory conversations regarding a potential joint venture and that these conversations took place in person in California, not in Texas. Singer pointed out that his only involvement with Ball Up was in his capacity as CEO of generally-appearing Strategic Distribution and stated that there were "never any negotiations where I would participate in my individual capacity in the proposed Ball Up joint venture."

Finally, Singer specifically denied Ball Up's allegations that he owns or operates all of the other entities Ball Up has sued:

36. Plaintiff alleges that I acted as the general partner of Defendant PG-ACP Holdings, L.P. with respect to the Ball Up project. [Record reference omitted.] I am not and have never been the general partner of PG-ACP Holdings, L.P., nor did I act in any such capacity. This entity's general partner is PG-ACP Holdings GP, LLC. I am the President and CEO of PG-ACP Holdings GP, LLC. Any actions I have taken on behalf of PG-ACP Holdings, LP were in my role as President and CEO of its general partner.

37. I am not an owner of Defendant Strategic Distribution.

38. I am not a shareholder of Defendant Strategic Partners, Inc.

39. I am not a shareholder of Defendant Strategic Partners Corp.

40. I am not a shareholder of Defendant Strategic Partners Acquisition Corp.

41. I am not a member of Defendant Strategic Partners Midco, LLC.

42. Individually, I do not own any voting units of defendant PG-ACP Holdings, L.P. My family collectively has indirect interests in PG-ACP Holdings, L.P., through various trusts, as holders of economic units. Those collective units constitute approximately

29

twenty percent of the outstanding units. In any event, the economic unit holders of the limited partnership did not control or direct PG-ACP Holdings, L.P.

43. I am not a member of Defendant PG-ACP Holdings GP, LLC.

44. I am not a shareholder of Defendant PG-ACP Acquisition Corp.

45. I am not a member of Defendant Strategic General Partners, LLC.

46. My personal deposit and investment accounts are separate from the deposit and investment accounts owned and controlled by the other Defendants named in this suit. These funds have never been comingled.

47. I do not use personal funds to purchase assets for any Defendant or to pay any defendant's expenses. No corporate assets of any Defendant are used or have been used to purchase assets owned by me or to pay any of my personal expenses. As an officer of the various defendant entities, in the event I advance funds to cover expenses, I am reimbursed for those expenses by the company on whose behalf I acted.

### D. Ball Up's Special-Appearance Response

Ball Up filed a single, combined special-appearance response addressing the Appellee Entities' and SPAC's special appearances together as "SP." Ball Up's jurisdictional allegations in its response do not attribute any act to any individual Appellee Entity or to SPAC but instead allege that "[t]he SP entities were so interconnected that they ceased to operate as separate entities and instead should be regarded as one entity for purposes of jurisdiction."

## E. Law on Personal Jurisdiction[20]

A Texas court may assert personal jurisdiction over a nonresident defendant only if the requirements of the Texas long-arm statute and of due process under the Fourteenth Amendment are satisfied. U.S. Const. amend. XIV, § 1; Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (West 2015); *Bristol–Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1779 (2017); *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016), *cert. denied*, 137 S. Ct. 2290 (2017); *Moki Mac River Expeditions*, 221 S.W.3d at 574. The Texas long-arm statute permits Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in Texas, which includes committing a tort in whole or in part in the state. Tex. Civ. Prac. & Rem. Code Ann. § 17.042; *TV Azteca*, 490 S.W.3d at 36. The long-arm statute's doing-business language allows the statute to reach as far as the federal constitutional requirements of due process will allow. Thus, the requirements of the long-arm statute are satisfied if an assertion of jurisdiction accords with federal due process limitations. *Moki Mac River Expeditions*, 221 S.W.3d at 575. Due process is satisfied when (1) the defendant has established minimum contacts with the forum state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

---

[20]We recently set forth general personal-jurisdiction law in *OZO Capital, Inc. v. Syphers*, No. 02-17-00131-CV, 2018 WL 1531444, at \*4 (Tex. App.—Fort Worth Mar. 29, 2018, no pet. h.) (mem. op.). We recite that standard here.

31

*BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017); *TV Azteca*, 490 S.W.3d at 36.

The United States Supreme Court has distinguished two types of jurisdiction, depending on the types of contacts: general (all-purpose) jurisdiction and specific (case-linked) jurisdiction. *BNSF Ry.*, 137 S. Ct. at 1558; *see also TV Azteca*, 490 S.W.3d at 37. A trial court may assert general jurisdiction over a nonresident defendant when that defendant's contacts with the forum are so continuous and systematic that they render the defendant "at home" in the forum state. *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014); *TV Azteca*, 490 S.W.3d at 37. The paradigm for exercising general jurisdiction over an individual is the person's domicile; for a corporation, it is an equivalent place in which the company is fairly regarded as at home, such as its domicile, place of incorporation, or principal place of business. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924, 131 S. Ct. 2846, 2853–54 (2011). Only a particular type of affiliation with a forum will render a defendant amenable to general jurisdiction in a state. *Bristol–Myers Squibb*, 137 S. Ct. at 1780.

In contrast, a trial court may exercise specific jurisdiction over a defendant only if the suit arises out of or relates to the defendant's forum contacts. *Id.* In other words, specific jurisdiction depends on the existence of activity or an occurrence that takes place in the forum state and is therefore subject to its regulation. *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919, 131 S. Ct. at 2851.

Concerning allegations of personal jurisdiction over a defendant based on the alter-ego theory, personal jurisdiction may exist over a nonresident defendant if the relationship between the foreign corporation and its parent corporation that does business in Texas is one that would allow the court to impute the parent corporation's "doing business" to the subsidiary. *BMC Software Belg., N.V.*, 83 S.W.3d at 798–99. The rationale for exercising alter-ego personal jurisdiction is that "the parent corporation exerts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.'" *Id.* (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983)). The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation because Texas law presumes that two separate corporations are indeed distinct entities. *Id.*

To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary and that the degree of control the parent exercises is greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice. *See PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 172 (Tex. 2007) (citing *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335–37, 45 S. Ct. 250, 251 (1925)). The proof required of a party seeking to fuse a parent company and

33

a subsidiary company for jurisdictional veil-piercing purposes is different and more strenuous than the proof required of a party seeking to fuse a parent and a subsidiary company for substantive veil-piercing purposes. *Id.* at 175.

## F. Analysis

### 1. No Specific Jurisdiction or General Jurisdiction Exists Over the Appellee Entities, SPAC, or Singer

#### a. Requisites for Specific Jurisdiction Under the Texas Long-Arm Statute Not Satisfied

To establish specific jurisdiction over the Appellee Entities, SPAC, and Singer in Texas, Ball Up was required to allege (1) what acts each of the Appellee Entities, SPAC, and Singer individually (2) committed in Texas related to Ball Up's claims against them for fraud/intentional misrepresentation, conspiracy, and alternatively negligent misrepresentation. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) (explaining that only the defendant's own actions may constitute purposeful availment; a defendant may not be haled into a jurisdiction based solely on the unilateral activities of a third party); *see also Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 157 (Tex. 2013) (holding nonresident defendant not subject to personal jurisdiction for alleged tortious interference claim because alleged acts of interference occurred outside Texas); *Kelly*, 301 S.W.3d at 659–60 ("GIC failed to plead facts within the reach of the long-arm statute because it did not allege that the Officers committed any tortious acts in Texas."). But Ball Up did not allege in its third amended original petition or in its response to the special

appearances that any act by any of the Appellee Entities, by SPAC, or by Singer individually occurred in Texas. *See Patel v. Pate*, No. 02-16-00313-CV, 2017 WL 2871684, at *5 (Tex. App.—Fort Worth July 6, 2017, no pet.) (mem. op.) (finding sufficient for minimum contacts allegations that "nonresident who, *while physically present in the State of Texas*," made statements alleged to be fraudulent) (emphasis added); *Petrie v. Widby*, 194 S.W.3d 168, 175 (Tex. App.—Dallas 2006, no pet.) ("[A] nonresident *who travels to Texas and* makes statements alleged to be fraudulent is subject to specific jurisdiction in Texas[.]") (emphasis added).

Although Ball Up's pleading alleges that the Appellee Entities, SPAC, and Singer improperly refused to continue funding or providing information to Ball Up in connection with the Ball Up Apparel Project and acted in concert to unlawfully harm Ball Up—arguably directing tortious conduct at a Texas business and with effects to be felt in Texas—there is no allegation that these alleged acts of wrongdoing *occurred in Texas*. *See Vinmar Overseas Sing. PTE Ltd. v. PTT Int'l Trading PTE Ltd.*, 538 S.W.3d 126, 133 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) ("When the plaintiff fails to allege an act by the defendant occurring in Texas, the plaintiff has not met its initial burden of pleading acts sufficient to invoke jurisdiction over the nonresident defendant."); *see also Patel*, 2017 WL 2871684, at *5; *Petrie*, 194 S.W.3d at 175.

Because neither Ball Up's jurisdictional allegations nor Ball Up's special-appearance evidence alleges or establishes that the Appellee Entities, SPAC, or

35

Singer individually performed any act in Texas related to the torts asserted against them or had any contacts with Texas, these defendants could meet their burden of factually negating all potential bases of personal jurisdiction over them by simply presenting evidence that they are nonresidents. *See Siskind*, 642 S.W.2d at 438 (holding that in view of the plaintiff's failure to allege any act by these individuals in Texas, the defendants sustained their burden by proving nonresident status); *Vinmar Overseas Sing. PTE Ltd.*, 538 S.W.3d at 133 (same); *George v. Deardorff*, 360 S.W.3d 683, 687 (Tex. App.—Fort Worth 2012, no pet.) (same); *Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 634 (Tex. App.—Dallas 1993, writ denied) (same).

### b. The Appellee Entities, SPAC, and Singer Negated Specific and General Jurisdiction

The Appellee Entities, SPAC, and Singer presented evidence establishing that they are nonresidents and had no contacts with Texas. Thus, because Ball Up failed to allege acts performed *in Texas* by the Appellee Entities, SPAC, and Singer and because the Appellee Entities, SPAC, and Singer presented evidence establishing that they are nonresidents and had no contacts with Texas, we hold that the trial court did not err by sustaining the special appearances of the Appellee Entities and Singer but did err by denying SPAC's special appearance. *See, e.g., Kelly*, 301 S.W.3d at 658 (holding that a defendant can factually negate plaintiff's alleged basis for personal jurisdiction by presenting evidence "that it has no contacts with Texas"); *see also Oryx Capital Int'l, Inc. v. Sage*

36

*Apartments, L.L.C.*, 167 S.W.3d 432, 441–43 (Tex. App.—San Antonio 2005, no pet).

## 2. The Special-Appearance Evidence Does Not Support the Alter-Ego/Veil-Piercing Theory as a Basis for Specific Jurisdiction or General Jurisdiction Over the Appellee Entities, SPAC, or Singer[21]

Alternatively, assuming Ball Up did sufficiently allege in its pleading and special-appearance response acts *in Texas* performed in furtherance of the torts it alleged, we would nonetheless reach the same disposition because Ball Up did not allege or prove any acts or contacts attributable to each of the individual Appellee Entities, to SPAC, or to Singer and did not prove an alter-ego/veil-piercing theory. Instead, Ball Up's appellate arguments, like its trial court pleadings and special-appearance response, focus on the acts or contacts of the SP Companies.

Because Texas law presumes that two separate corporations are distinct entities, Ball Up, as the party seeking to ascribe the actions of some of the SP Companies to other of the SP Companies for jurisdictional purposes by piercing the corporate veil, bore the burden of proving an alter-ego relationship. *See BMC Software Belg., N.V.*, 83 S.W.3d at 798. Absent proof by Ball Up establishing a factual basis for some legal theory, such as alter-ego or single-

---

[21]Ball Up does not raise an issue challenging the trial court's implied negative finding on Ball Up's alter-ego/veil-piercing jurisdictional theory but does argue in its brief that "the Court can also find jurisdiction by finding that the defendants acted as alter egos of entities and persons to which jurisdiction attaches."

business enterprise, to attain corporate veil piercing that will support the aggregation of acts or contacts by separate legal entities, they will not be aggregated. *See PHC-Minden*, 235 S.W.3d at 172 (explaining that to fuse entities for jurisdictional purposes, a plaintiff must prove that one entity controls the internal business operations and affairs of the other entity to an extent greater than that normally associated with a parent/subsidiary relationship to the extent that the two entities in fact cease to be separate); *Morris v. Kohls–York*, 164 S.W.3d 686, 693 (Tex. App.—Austin 2005, pet. dism'd) (recognizing that defendants' contact cannot be aggregated because personal jurisdiction is grounded on each individual defendant's actions and choices to enter Texas and do business in Texas). That is, Ball Up's pleadings and briefing relating to acts performed by and contacts with the SP Companies (assuming the facts pleaded such contacts and acts occurred in Texas) is nonetheless not sufficient to establish general-jurisdiction minimum contacts or specific committed-a-tort-in-whole-or-in-part-in-Texas jurisdiction unless the acts and contacts Ball Up has attributed to the SP Companies are attributable to one or more of the Appellee Entities, to SPAC, or to Singer under an alter-ego/veil-piercing theory. *See Kelly*, 301 S.W.3d at 658 (holding trial court correctly sustained foreign defendants' special appearance when plaintiff failed to plead that defendants lived in Texas or perpetrated any fraudulent acts in Texas).

On appeal, Ball Up does not focus on the purported alter-ego relationship existing between any particular SP Companies or Singer. Instead, Ball Up

38

argues that personal jurisdiction exists under the alter-ego/veil-piercing theory because the SP Companies "cannot prove which company(ies) made the decisions on the Ball Up project, they cannot prove which company(ies) did not make the decisions on the Ball Up Project" and that, therefore, "<u>none of these entities can negate Ball Up's allegations that they were involved in the project</u>." But Ball Up—not the Appellee Entities, SPAC, or Singer—had the burden of pleading and proving an alter-ego/veil-piercing theory in order to attribute contacts with the forum by one defendant to another defendant or to attribute jurisdictional acts by one defendant to another defendant.

Ball Up had the burden to overcome the presumption that two separate business entities are distinct by proving its alter-ego/veil-piercing allegation. *See BMC Software Belg., N.V.*, 83 S.W.3d at 798 (explaining that "[t]he party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation"). To fuse all of the SP Companies for jurisdictional purposes—that is, to make the acts or contacts of the generally-appearing defendants Strategic Partners, Inc.; Strategic Distribution, LP; and Strategic General Partners, LLC or of other specially-appearing defendants constitute acts or contacts by the Appellee Entities, SPAC, or Singer—Ball Up was required to establish that the Appellee Entities, SPAC, or Singer exercised a degree of control over Strategic Partners, Inc.; Strategic Distribution, LP; and Strategic General Partners, LLC that is "greater than that normally associated with common ownership and directorship"; the evidence must show that the

39

Appellee Entities, SPAC, Singer, and the generally-appearing defendants or some combination of these ceased to be separate. *See id.* at 799.

The following factors have been identified as important to determining whether a subsidiary is separate and distinct from its parent corporation for personal jurisdiction purposes: (1) the amount of the subsidiary's stock owned by the parent corporation, (2) the existence of separate headquarters, (3) the observance of corporate formalities, and (4) the degree of the parent's control over the general policy and administration of the subsidiary. *See PHC–Minden,* 235 S.W.3d at 175. The types of evidence a court will consider as proof of alter ego—when a person is alleged to be the alter ego of a corporation but also applicable in allegations of entity-to-entity alter ego—include: (1) the payment of alleged corporate debt with personal checks or other commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for his personal use; (4) inadequate capitalization; and (5) other failure to keep corporate and personal assets separate. *See Guarino v. 11327 Reeder Rd., Inc.*, No. 05-12-01573-CV, 2013 WL 4478202, at *4 (Tex. App.—Dallas Aug. 20, 2013, no pet.) (mem. op.) (holding alter-ego jurisdictional evidence insufficient to establish nonresident individual was alter ego of entity); *see also Booth v. Kontomitras*, 485 S.W.3d 461, 483 (Tex. App.—Beaumont 2016, no pet.) (listing types of evidence a court may consider in determining alter-ego relationship).

40

Ball Up did not offer evidence of financial commingling of funds between any combination of the SP Companies and Singer, the payment of one of the SP Companies' debt by another or by Singer, the diversion of profits from one SP Company to another or to Singer, the failure to keep separate accounting records or corporate books, a lack of separate legal formation, or other evidence that would establish that the Appellee Entities, SPAC, or Singer exercised a degree of control over Strategic Partners, Inc.; Strategic Distribution, LP; and Strategic General Partners, LLC that is greater than that normally associated with common ownership and directorship so that the Appellee Entities, SPAC, and the generally-appearing defendants ceased to be separate entities. *See BMC Software Belg., N.V.*, 83 S.W.3d at 799; *cf. Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 485 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding evidence sufficient to support trial court's alter-ego/veil-piercing finding based on facts not present here).

The evidence Ball Up did produce with regard to SPAC consisted of two spreadsheets containing SPAC's name that were provided to Ball Up and that detailed the Ball Up Apparel Project's expenses. Ball Up argues that these spreadsheets coupled with the alleged failure of the SP Companies to maintain separate and distinct corporate identities is sufficient to support the trial court's denial of SPAC's special appearance. We cannot agree. Even if SPAC created the spreadsheet for the project's current expenses, the two spreadsheets simply represent a calculation of expenses and do not establish any amounts billed by

41

SPAC or work performed by SPAC. Thus, the spreadsheets are insufficient to support a showing that SPAC has the minimum contacts necessary to demonstrate that the trial court has personal jurisdiction over SPAC. *See BMC Software Belg., N.V.*, 83 S.W.3d at 799 (holding parent's and subsidiary's common financial reports and interchangeable letterhead were not sufficient to support alter-ego theory of personal jurisdiction).

The evidence Ball Up did produce with regard to the Appellee Entities consisted of excerpts from Pierpoint's deposition establishing that the composition of the board of directors of each of the SP Companies was the same or substantially the same; that Padraic McConville worked for Partners Group; that Partners Group was a private equity partner that sat on the board of directors for PG-ACP Holdings, GP; and that McConville put Ball Up proposal numbers together for the PG-ACP Holdings, GP's board of directors. Ball Up's evidence and contentions, however, do not rise to the required level of control and domination by one or more of the SP Companies over one or more of the other SP Companies necessary to meet Ball Up's burden of proving that the SP Companies ceased to be separate entities and are one and the same for jurisdictional purposes.[22] *See PHC-Minden*, 235 S.W.3d at 172; *see also Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex. 1975) ("A subsidiary

_____

[22]Ball Up does not specifically identify which of the generally-appearing defendants, the Appellee Entities, or SPAC are purportedly fused for jurisdictional purposes; Ball Up alleges all of them were intertwined and acted jointly.

corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders."); *N. Frac Proppants, II, LLC v. 2011 NF Holdings, LLC*, No. 05-16-00319-CV, 2017 WL 3275896, at *6 (Tex. App.—Dallas July 27, 2017, no pet.) (mem. op.) (recognizing that "an entity's owner may monitor the entity's performance, supervise its financial and capital budget decisions, and articulate general policies without becoming fused to the entity for jurisdictional purposes").

Ball Up's alter-ego/veil-piercing jurisdictional evidence at most shows some common ownership between the SP Companies and some common and overlapping boards of directors; this type of evidence does not establish alter ego for jurisdictional purposes.[23]  *See TMX Fin. Holdings, Inc. v. Wellshire Fin. Servs., LLC*, 515 S.W.3d 1, 8–9 (Tex. App.—Houston [1st Dist.] 2016, pet. filed) (recognizing that "common ownership, even when combined with common corporate officers, does not demonstrate that a parent and subsidiary are alter egos"); *PT Intermediate Holding, Inc. v. LMS Consulting, LLC*, No. 04-14-00827-CV, 2015 WL 5438964, at *4 (Tex. App.—San Antonio Sept. 16, 2015, pet. denied) (mem. op.) ("The type of parental control that confers jurisdiction [via an

---

[23]If Ball Up had met its burden of proving alter ego, no evidence exists that piercing the corporate veil of any particular entity or entities for purposes of personal jurisdiction is necessary to prevent fraud or injustice.  *See Booth*, 485 S.W.3d at 483 (explaining that in the absence of allegations or evidence demonstrating fraud or injustice, court would not find alter ego for jurisdictional purposes).

alter-ego theory] is evidenced by a 'plus' factor: 'something beyond the subsidiary's mere presence within the bosom of the corporate family.'"); *see also N. Frac Proppants, II, LLC*, 2017 WL 3275896, at \*6 ("Alter ego cannot be based on mere stock ownership, duplication of some or all directors or officers, or exercise of the control that stock ownership gives to stockholders.").

Because Ball Up failed to assert or to offer proof of acts by the Appellee Entities, SPAC, and Singer in furtherance of Ball Up's tort claims against them and also failed to meet its burden of proving its alter-ego/veil-piercing jurisdictional theory concerning the Appellee Entities, SPAC, and Singer, the trial court properly sustained the Appellee Entities' and Singer's[24] special appearances and erred by denying SPAC's special appearance. *See Moki Mac River Expeditions*, 221 S.W.3d at 574; *Vinmar*, 538 S.W.3d at 133. We sustain SPAC's sole issue in its appeal, and we overrule Ball Up's second and third issues in its appeal.

_____

[24]In addition to factually negating personal jurisdiction, Singer's affidavit and special-appearance evidence legally negated personal jurisdiction; Singer established that at all times in any dealings with Ball Up he was acting in his corporate capacity on behalf of generally-appearing Strategic Distribution. Thus, even if Singer had contacts with Texas or performed acts in Texas—which he directly denied in his affidavit—personal jurisdiction over him could not be predicated on jurisdiction over Strategic Distribution unless Strategic Distribution is the alter ego of Singer. *See, e.g.*, *J & J Marine, Inc. v. Le*, 982 S.W.2d 918, 927 (Tex. App.—Corpus Christi 1998, no pet.); *Garner v. Furmanite Austl. Pty., Ltd.*, 966 S.W.2d 798, 803 (Tex. App.—Houston [1st Dist.] 1998, pet. denied); *Clark v. Noyes*, 871 S.W.2d 508, 518 (Tex. App.—Dallas 1994, no writ) (citing *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985)).

## V. CONCLUSION

Having overruled Ball Up's three issues and having sustained SPAC's sole issue, we affirm the trial court's orders granting Singer's and the Appellee Entities' special appearances, we reverse the trial court's denial of SPAC's special appearance, we render judgment dismissing SPAC from the suit filed by Ball Up, and we remand this case for further proceedings.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL:  WALKER, MEIER, and BIRDWELL, JJ.

DELIVERED:  August 2, 2018